CRAWFORD ET AL., APPELLANTS, *v.* THE STATE OF OHIO, DIVISION OF PAROLE
AND COMMUNITY SERVICES, APPELLEE.

[Cite as Crawford *v.* Ohio Div. of Parole & Community Serv. (1991),
57 Ohio St. 3d 184.]

(No. 89-1431—Submitted October 2, 1990—Decided February 20, 1991.)

---

[1] Maynard is now serving a life sentence. The record shows that on the night of August 6, 1984, Charles Crawford drove with his wife to a local grocery store in Northwood, Ohio. While his wife went inside the store to purchase milk for a grandchild, Crawford waited in his parked car. Maynard approached the vehicle, and during the attempted robbery he shot Crawford in the chest while Crawford was pleading for help.

[2] During the time he was incarcerated, Maynard's psychological profile revealed that he was the type of person who committed violent crimes without regard to the consequences. Maynard was denied parole in 1982 because he was an undue risk to public safety and there was a substantial reason to believe he would engage in further criminal conduct.

---

[3] As Chief of the Ohio Adult Parole Authority, Shoemaker generally oversaw all Ohio furlough programs. John Dean was the Acting Director of the Columbus Reintegration Center, but also had duties as Assistant Furlough Coordinator for three reintegration centers, in Columbus, Cleveland and Cincinnati. Rick Griffin was the Deputy Director of the Columbus Reintegration Center, who, according to Dean's testimony, was more involved with the Center's day-to-day operations. Shoemaker testified that he delegated the responsibility to operate the Columbus Center to those underneath him, and that they had direct responsibility in the day-to-day management of the Center. A furlough officer was the person primarily responsible for the furloughees while they were in the furlough program. The furlough officer was to have direct contact with a furloughee at least twice per week. Jean Patrick was assigned to Maynard, and it was she who most likely had more knowledge than anyone else concerning Maynard's condition during his release on furlough.

*Connelly, Soutar & Jackson, William M. Connelly* and *Steven P. Collier,* for appellant.

*Lee I. Fisher,* attorney general, and *Susan M. Sullivan,* for appellee.

ALICE ROBIE RESNICK, J. Appellant essentially advances two arguments in support of reversing the judgment of the court of appeals. First, she contends that the decision to send Maynard to A.A. is not a basic policy decision evidencing a high degree of official judgment or discretion, and thus the state is not entitled to immunity on this basis. Second, appellant argues that the state was negligent *per se* in allowing Maynard to attend an A.A. meeting outside the confines of the Center, since A.A. is not an "educational program" pursuant to R.C. 2967.26(B).

## I

In her first proposition of law, appellant argues that the decision to send Maynard to an A.A. meeting outside the confinement of the Center is not a decision for which sovereign immunity affords protection. The law in Ohio regarding state governmental immunity is that "* * * the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. However, once the decision has been made to engage in a certain activity or function, the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." *Reynolds* v. *State* (1984), 14 Ohio St. 3d 68, 14 OBR 506, 471 N.E. 2d 776, paragraph one of the syllabus.

Appellant asserts that the determination to send Maynard to A.A. is not a decision "involving the making of a basic policy * * * which is characterized by the exercise of a high degree of official judgment or discretion." In support, appellant contends that allowing Maynard to attend an outside A.A. meeting does not involve a basic policy decision because the decision affected only one furloughee — Maynard. Moreover, it was admitted by the state that this type of privilege had never previously been granted to any furloughee.

Likewise, appellant asserts that the decision to send Maynard to A.A. was not characterized by a high degree of official judgment or discretion. To buttress this assertion, appellant points to the following facts: that John Shoemaker, Chief of the Ohio Adult Parole Authority, made this decision in response to complaints by Maynard's wife; that Shoemaker did not consult the persons most knowledgeable about Maynard, either Jean Patrick, Maynard's furlough officer, or the Deputy Director of the Center, Rick Griffin; that Shoemaker himself was unaware of any other instance when such a privilege had been granted; and that Shoemaker made the decision without performing a reasonable investigation. Similarly, appellant suggests that if Shoemaker had made a reasonable investigation, he would have discovered that the Center had a quality in-house alcohol program that Maynard was required to attend, and that Maynard had a poor history of complying with the rules of the Center.

Upon considering the above facts, we agree with appellant that the decision to send Maynard to A.A. is not entitled to immunity. The determination to send *one particular individual* to outside A.A. meetings cannot be said to be a "basic policy decision" within the meaning of *Reynolds, supra*. Likewise, as demonstrated above, the determination is not characterized by the exercise of a high degree of official judgment or discretion. Rather, it is a decision that is operational in nature, relating to the day-to-day business of the Center. As such, it is analogous to a ministerial act for which the state may be held liable. See *Brodie* v. *Summit Cty. Children Services Bd.* (1990), 51 Ohio St. 3d 112, 554 N.E. 2d 1301.

Perhaps more important, however, we find that there is no statutory authority for Shoemaker to make a unilateral change regarding the programs that a particular furloughee may attend. R.C. 2967.26(A) provides that "[t]he adult parole authority may grant furloughs to trustworthy prisoners * * * for the purpose of employment, vocational training, educational programs, or other programs *designated by the director of*

*rehabilitation and correction within this state.* * * *" (Emphasis added.) There is no evidence that the Director of Rehabilitation and Correction had designated A.A. meetings as an "educational" or "other" program. Likewise, paragraph (C) of R.C. 2967.26 stated at the relevant time that "* * * [t]he authority shall, subject to approval by the director of rehabilitation and correction, adopt rules for granting furloughs, supervising prisoners on furlough, and administering the furlough program. * * *" 140 Ohio Laws, Part I, 583, 610. A diligent search of the applicable Ohio Administrative Code provisions (Ohio Adm. Code 5120:1-1 *et seq.*) reveals that no rule was adopted by the Adult Parole Authority that permitted Shoemaker to change Maynard's furlough conditions and send him or any other furloughee to an outside A.A. meeting. Shoemaker testified that his decision was not specifically authorized by statute, and the state does not cite any statute or administrative rule which grants Shoemaker such authority. Similarly, John Dean, the Acting Director of the Center, testified that he was not aware of any legal opinions or memoranda prior to May 1984 which classified the A.A. program as educational or vocational in nature.

Given the dictates found in R.C. 2967.26 concerning the respective roles of the Adult Parole Authority and the Director of Rehabilitation and Correction, we believe the language employed evidences a legislative intent to establish a system of checks and balances concerning the programs which furloughed prisoners may attend. A.A. meetings are not traditionally known as educational programs. Before attendance by a furloughee at an A.A. meeting may be considered statutorily authorized, the Director of Rehabilitation and Correction would be required to designate A.A. as an "other progra[m]" in order to qualify under R.C. 2967.26(A). There is no evidence that A.A. has been so designated by the Director. Pursuant to R.C. 2967.26(C), the Adult Parole Authority did not, and most likely could not, adopt a rule allowing the Chief of the Adult Parole Authority to change a furloughed prisoner's conditions and terms of release.[5] Thus, absent any statutory grant of power to change Maynard's conditions of furlough, the decision by Shoemaker to send Maynard to an outside A.A. meeting is not protected by governmental immunity. For all of the above reasons, the trial court's ruling that the state enjoys immunity for the decision to send Maynard to an A.A. meeting was erroneous. Moreover, as will be fur-

---

[5] While not in effect at the time in question, Ohio Adm. Code 5120:1-1-24 lends credence to our position, and states as follows:

"(A) The chief of the adult parole authority, through the coordinator of the educational and vocational furlough program and the coordinator of community residential programs, shall be responsible for the development of community, educational, and employment programs for inmates released on furlough. *Inmates may engage in other programs designated and approved by the director of rehabilitation and correction or activities approved by the chief of the division of parole and community services.*" (Emphasis added.)

The obvious intent of the administrative rules and applicable Revised Code provision is to deprive the Chief of the Adult Parole Authority of absolute discretion concerning which programs a furloughed prisoner will or will not attend. The mechanism through which this is achieved is much like a system of checks and balances.

ther demonstrated below, permitting Maynard to attend an outside A.A. meeting was negligence *per se.*

## II

Appellant's second proposition of law postulates that the state was negligent *per se* in failing to confine Maynard pursuant to R.C. 2967.26(B), when Maynard was not legitimately outside the confines of the Center. A necessary corollary of this assertion is that attendance at A.A. is not within the purview of R.C. 2967.26(B). At the time in question, R.C. 2967.26(B) provided as follows: "A prisoner who is granted a furlough pursuant to this section *shall* be confined for any periods of time that he is not actually working at his approved employment or engaged in a vocational training or other educational program. * * *" (Emphasis added.) 140 Ohio Laws, Part I, 583, 609-610. The General Assembly's use of the word "shall" connotes the mandatory nature of the statute.

The furlough program was designed to reintegrate prisoners into the community in a closely supervised environment. Furloughs for employment, education or vocational training are excellent ways to mainstream certain convicted felons into a productive life after they are released from prison. However, the furlough pro-

gram must be operated in such a manner that the safety of innocent citizens is not jeopardized by the presence of dangerous furloughees who are not properly supervised.[6]

The crux of this issue is whether Kenneth Maynard was "confined" pursuant to R.C. 2967.26(B). In *Reynolds, supra,* we held at paragraph two of the syllabus that "[o]nce a decision has been made to furlough a prisoner pursuant to R.C. 2967.26, a cause of action can be maintained against the state for personal injuries proximately caused by the failure to confine the prisoner during non-working hours in accordance with R.C. 2967.26(B). Such a failure to confine is negligence *per se,* and is actionable pursuant to R.C. 2743.02." Thus, while the initial decision to allow a prisoner to participate in a furlough program is entitled to immunity, the state's failure to properly confine a prisoner in accordance with R.C. 2967.26(B) is negligence *per se.* In other words, if Maynard was not confined within the meaning of the statute, negligence *per se* existed.

Appellant argues Maynard was not properly confined for two reasons. First, appellant contends that the outside A.A. meeting is not a "vocational training or other educational program" within the context of R.C. 2967.26(B). Because Maynard committed the murder while not confined to

---

[6] Ohio Adm. Code 5120:1-1-02 establishes a statement of policy, and currently provides in part:

"(D) The release procedures in these Administrative Regulations provide for orienting the inmate toward release, the preparation for the Parole Board of all data pertinent to the case, a release hearing based upon careful study of such data under procedures which insure fairness and rational decision making, formulation and investigation of a satisfactory release plan,

release under professional supervision, and return to confinement for those who violate the terms and conditions of their release and are unwilling or unable to readjust satisfactorily under supervision.

"(E) Emphasis is placed on supervision and such custody as is necessary to protect the interests of society. * * *
"* * * *

"(G) * * * Unlimited discretion is to be eliminated. Necessary discretion is to be structured."

the Center or at an acceptable vocational or educational program, appellant argues that the state was negligent *per se*. Second, appellant asserts that even if A.A. meets the "other educational program" criteria contained in the statute, the state was negligent *per se* when it allowed Maynard to walk away from the meeting after he had phoned the Center to arrange transportation back.

Both parties strenuously argue the issue as to whether A.A. is an "educational program" pursuant to R.C. 2967.26(B).[7] We have already determined that the A.A. meeting Maynard was authorized to attend cannot qualify as an "educational program" within the purview of R.C. 2967.26(B) because the statutory and administrative requirements regarding such attendance were not followed. Moreover, it is readily apparent from the record that neither Shoemaker nor anyone at the Center considered the A.A. meeting to be an educational program. Maynard's itinerary sheet shows that his attendance at the A.A. meeting was recorded under the category of *supplemental time,* not educational/vocational time. (See Appendix.) Thus, the Center never contemplated Maynard's participation at A.A. as an educational program. As a result, it is manifest that Maynard was not attending a program contemplated by R.C. 2967.26(B). Consequently, Maynard was not confined according to the requirements of the statute when he murdered Charles Crawford. In accordance with our decision in

*Reynolds, supra,* we find that the state was negligent *per se* for not properly confining Maynard under R.C. 2967.26(B).

Thus, we hold that pursuant to R.C. 2967.26, a furloughee must be confined for any period of time that he is not actually working at his approved employment, or engaged in a vocational training or educational program, or engaged in another program designated by the Director of Rehabilitation and Correction of the state of Ohio. The state's failure to properly confine a furloughee according to the mandatory language of R.C. 2967.26(B) is negligence *per se*. Because appellant has set forth cognizable causes of action, we reverse the judgment of the court of appeals and remand this case for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., SWEENEY, DOUGLAS and H. BROWN, JJ., concur.

HOLMES, J., dissents.

WRIGHT, J., dissents with opinion.

WRIGHT, J., dissenting. As a former trial judge I am well aware of the difficult and facially unpopular executive decision to set up a "halfway house" plan for long-term prisoners. This re-entry system, however, is an absolute necessity for reducing the

---

[7] Appellant relies heavily on the fact that the Center already had a quality alcohol treatment program on the premises. The state counters this argument by asserting that the in-house program was not an anonymous program, whereas A.A. is by its very nature anonymous. The record demonstrates that Shoemaker's decision to send Maynard to A.A. had nothing whatsoever to do with anonymity, but instead was precipitated by persistent complaints from Maynard's wife to Shoemaker.

high rate of recidivism common to this type of felon. Corrections experts believe that this methodology cuts the return to crime by half — surely a worthwhile goal. Today the majority has done grave damage to Ohio's prisoner furlough program by perpetuating and enlarging our mistaken decision in *Reynolds* v. *State* (1984), 14 Ohio St. 3d 68, 14 OBR 506, 471 N.E. 2d 776. As night follows day, our next decision will hold the state liable for the criminal acts of someone who simply walks away from a halfway house or some other low security institution. Incredibly, we have made the state an insurer for every manner of criminal conduct. This cannot represent a valid public policy.

In *Reynolds,* this court erroneously held that a violation of the duty to confine furloughed prisoners pursuant to R.C. 2967.26 constituted negligence *per se* and consequently imposed liability on the state for injuries caused by the criminal acts of an escaped prisoner. The holding in *Reynolds,* sovereign immunity aside, incorrectly applied the legal doctrine of negligence *per se,* found a legal duty insupportable at law, and distorted the principle of proximate causation. In its efforts to follow *Reynolds,* the majority has dismissed without comment the trial court's finding of no proximate cause and has substituted its view of the reasonableness of the state's conduct for the view of the trial court under the misguided veil of negligence *per se.*

## I

Negligence *per se* is a legal doctrine that presumes negligence where a statute that provides a standard of care to protect a class of persons from a particular risk is violated. But the presumption arises only when the violation results in the type of injury that the statute was designed to protect against. Prosser & Keeton, Law of Torts (5 Ed. 1984) 223-227, Section 36. Application of the doctrine to the mandate of R.C. 2967.26 ignores the essential requirements of the doctrine.

Negligence *per se* is appropriate only for statutes that impose a standard of care the breach of which may fairly be presumed to be negligent. For example, a traffic statute that forbids crossing a double yellow line is ripe for negligence *per se* analysis. R.C. 2967.26, however, imposes a duty without providing a standard of care. Prisoner escapes from the furlough program are quite likely to occur absent negligence in the state's efforts to confine, while people are not likely to cross double yellow lines absent negligence. By applying negligence *per se* analysis to this statute, the majority would hold the state negligent for failing to head off all possible modes of escape that the active mind of an idle prisoner can conjure up. Such is not negligence *per se*; rather, it is strict liability. See, generally, Prosser & Keeton, *supra.*

## II

Negligence *per se* also requires that the statute be intended to protect a class of persons from a particular risk.[8] Prosser & Keeton, *supra,* at 224-225. The majority has ignored these requirements by holding that the duty to confine imposed by R.C. 2967.26 is intended to protect individual members of the public from the criminal acts of prisoners. The majority's reasoning has two fatal flaws:

---

[8] These elements of negligence *per se* analysis provide the requisite duty and scope of duty components required in traditional negligence analysis.

the duty to confine pursuant to R.C. 2967.26 is owed only to the general public and not to individuals, and is *not* intended to protect the public from the criminal acts of furloughed prisoners.

Any duty the state owes under R.C. 2967.26 is owed generally to the public and not specifically to any individual or class of individuals. Breach of such duties cannot form the basis of tort liability: "When a duty which the law imposes upon a public official is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, is generally a public and not an individual injury." *Sawicki* v. *Ottawa Hills* (1988), 37 Ohio St. 3d 222, 525 N.E. 2d 468, paragraph two of the syllabus. Accord *Commerce & Industry Ins. Co.* v. *Toledo* (1989), 45 Ohio St. 3d 96, 543 N.E. 2d 1188. Numerous other jurisdictions have held that the duty to confine prisoners is owed only to the general public and, therefore, individual persons injured by escaped prisoners have no cause of action against the state for a negligent effort to confine. See, *e.g., Massey* v. *Grant* (W.D. Mich. 1988), 679 F. Supp. 711 (applying Michigan law); *Cady* v. *State* (App. 1981), 129 Ariz. 258, 630 P. 2d 554; *Williams* v. *State* (1955), 308 N.Y. 548, 127 N.E. 2d 545. Caught up in the seriousness of the facts of this case, this court has erred today by ignoring this salutary principle of basic tort law.

Society incarcerates criminals for a variety of reasons. These include the primary considerations of punishment, deterrence, correction and rehabilitation, as well as the protection of socie-ty from dangerous persons.[9] The furlough program is designed for prisoners whom the state has determined to be trustworthy. R.C. 2967.26(A). See *Reynolds, supra,* at 70, 14 OBR at 508, 471 N.E. 2d at 778 (the state has immunity from suit in deciding whether a prisoner is eligible for furlough and, by implication, whether the prisoner is trustworthy). Further, the furlough program utilizes unsupervised release of prisoners for work and other programs. Because the unsupervised release of trustworthy prisoners has nothing to do with the goal of protecting society from dangerous criminals, manifestly, the purpose behind the duty to confine furloughed prisoners is not to protect society, but rather to further the goal of rehabilitation by preparing these individuals to re-enter society.[10] This was a judgment call made by the General Assembly and the executive branch. Therefore, the R.C. 2967.26 duty to confine does not create a duty owed by the state to protect individual members of society from the criminal acts of furloughed prisoners.

### III

In my view, the majority has seized upon and extended the mistaken notion that the state's inability to confine a prisoner is the proximate cause of that escaped prisoner's criminal conduct. Criminal behavior is the volitional act of the escapee. While alleged negligence in the confinement of a prisoner may be a "but-for" cause of subsequent harm caused by criminal

---

[9] For example, compare society's interests in weekend incarcerations of drunk drivers to society's interest in executing persons convicted of aggravated murder.

[10] I note further the patent inconsistency in *Reynolds, supra,* where the state has immunity in choosing to furlough a particular prisoner and therefore in deciding whether a prisoner is trustworthy, then is held strictly liable under the guise of negligence *per se* for criminal acts the "trustworthy" prisoner commits on escape.

behavior, it is not the proximate cause of an escapee's subsequent criminal activities. *Collie* v. *Hutson* (1985), 175 Ga. App. 672, 334 S.E. 2d 13; *Williams, supra; Moss* v. *Bowers* (1939), 216 N.C. 546, 5 S.E. 2d 826. See, also, *Marshall* v. *Winston* (Va. 1990), 389 S.E. 2d 902 (acts of assaultive criminal behavior cannot reasonably be foreseen).[11]

And yet, the majority has further distorted the law of proximate cause through its flawed application of negligence *per se*. Maynard escaped from the furlough program while attending an Alcoholics Anonymous ("A.A.") meeting. R.C. 2967.26 provides specifically that furloughed prisoners may be released to attend educational and other programs. There can be no doubt that A.A. is educational as well as rehabilitative and thus an acceptable program pursuant to R.C. 2967.26.[12] Yet, the majority imposes liability merely because the Director of Rehabilitation and Correction had not specified A.A. as an acceptable pro-

gram. This sort of circular reasoning escapes me.

Director approval of an R.C. 2967.26 program prior to releasing prisoners for the program is intended to ensure that the program is appropriate for furloughed prisoners and *not* to protect citizens from the criminal acts of escaped prisoners. Because the requirement of program approval has nothing to do with confinement, let alone the policy of protecting the public, its breach was neither the breach of a duty that was intended to protect the Crawfords from criminal activity nor the proximate cause of Charles Crawford's death. However, under the majority's reasoning, whether the Director had approved A.A. as an acceptable program — which the Director surely could have — is pivotal in determining whether the state caused Mr. Crawford's death. This result is absurd.

### IV

In reality, the majority appears to

---

[11] Louisiana, one of the few jurisdictions that imposes liability on the state for damage caused by the criminal acts of an escaped prisoner, imposes liability only under circumstances more suggestive of proximate cause. *E.g., Brown* v. *American Druggists' Ins. Co.* (La. App. 1985), 476 So. 2d 881, certiorari denied (1985), 479 So. 2d 365, reconsideration denied (1986), 481 So. 2d 623. In *Brown,* the state was held civilly liable for murder upon the theory of negligent confinement. The court specifically found proximate causation because the murder occurred within several hours of escape, within several miles of the place of confinement, while the escapees were seeking transportation in furtherance of escape. See, also, *State* v. *Silva* (1970), 86 Nev. 911, 478 P. 2d 591.

In stark contrast to *Brown,* this case involves a complete lack of temporal and geographical proximity between the allegedly negligent conduct and Maynard's criminal

acts and, thus, no proximate causation. Maynard was on the loose for over two months, and killed Mr. Crawford in the Toledo area after having escaped from Columbus.

[12] The majority places great significance on the fact that the reintegration center had its own alcoholism program. However, this is irrelevant in the negligence *per se* analysis and, as the trial court astutely observed, A.A. had an advantage over the in-house program in that A.A. preserves anonymity in order to promote free discussion and honesty. The majority flippantly dismisses this argument on the grounds that Shoemaker was nagged into sending Maynard to A.A. by Maynard's wife. While this may or may not be true, nevertheless, the interests of rehabilitation may well be served by providing a furloughed prisoner with the opportunity to discuss personal problems outside the presence of fellow prisoners.

have substituted its assessment of the reasonableness of the state's conduct for that of the trial court instead of applying negligence *per se* analysis. While claiming to base its decision on a statutory violation, the majority opinion is chock full of facts and analysis that have little to do with the statutory violation on which liability is supposedly based, but rather demonstrate the majority's belief that the state unreasonably furloughed a dangerous criminal and then unreasonably supervised him. Consequently, under the guise of negligence *per se*, the majority has undertaken a *de novo* review of this case in derogation of this court's traditional respect for the finder of fact.

## V

As stated, the real tragedy arising from the majority's decision is the potential destruction of furlough programs. By making the state the guarantor of the conduct of furloughed prisoners, the majority has placed an intolerable financial burden on the state. It is difficult to conceive of how the state can afford to continue running furlough programs under the rule of law announced by this court today. I believe today's decision cries out for a legislative response.

For these reasons, I dissent from the opinion of the majority.

NAME: __MAYNARD, KENNETH__          WORKING HOURS: _____

### EDUCATIONAL/VOCATIONAL PROGRAM:

| DATE | EMPLOYER/AGENCY | ADDRESS | TELEPHONE NUMBER | TIME OUT | ESTIMATED TIME BACK | STAFF APPROVAL | ACTUAL TIME IN | STAFF INITIALS | TIME CHECK |
|---|---|---|---|---|---|---|---|---|---|
| 5/21/84 | McClendon Enterprise | 1030 Buffalo Rd | 486-5597 | 11:29 Am | 6:00 pm | Annie | 5:00 Pm | RWclo | |
| 5/22/84 | McClendon Enterprise | 1050 Buffalo Rd | 486-5597 | 6:45 Am | 6:00 pm | 80 | 5:45 pm | | |
| 5/23/84 | McClendon Enterprise | 1030 Buffalo Rd | 486-5897 | 7:00 Am | | 80 | 9:25 pm | Wick | |
| 5-24-84 | McClendon Enterprise | 1050 Buffalo Rd | 486-5597 | 7:25 Am | 6:00 pm | AN | 5:30 pm | WMcClo | |

5/24/84 AWOL   Indy. restriction - 5-21-84

### COMMUNITY HOURS: (Supplemental Program)

| DATE | NAME OF INDIVIDUAL | ADDRESS | TELEPHONE NUMBER | TIME OUT | ESTIMATED TIME BACK | STAFF APPROVAL | ACTUAL TIME IN | STAFF INITIALS | TIME CHECK |
|---|---|---|---|---|---|---|---|---|---|
| 5/24/84 | House of Hope (HH) | 825 Venus | 89-24-431 | 7:00 PM | 10:30 pm | WMcC | | | |

FILED

NOV 14 1989

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

PLAINTIFF'S DEPOSITION EXHIBIT 6

PLAINTIFF'S EXHIBIT 10
85-0858