Gordon **STANLEY**, Petitioner–Appellant,

v.

Melody L. **TURNER**, Respondent–Appellee.

No. 92–4145.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 20, 1993.

Decided Oct. 1, 1993.

---

Harry R. Reinhart (argued and briefed), Columbus, OH, for petitioner-appellant.

Stuart A. Cole, Asst. Atty. Gen. (argued and briefed), Columbus, OH, for respondent-appellee.

Before: MILBURN and NELSON, Circuit Judges, and GILMORE, Senior District Judge.[*]

MILBURN, Circuit Judge.

Petitioner Gordon Stanley, an Ohio prisoner, appeals from the judgment of the district court dismissing his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. On appeal, the issues are (1) whether Ohio's involuntary manslaughter statute, O.R.C. § 2903.04, contains a constitutionally satisfactory element of mental culpability, and (2) whether the trial jury was correctly instructed as to that element of the case. For the reasons that follow, we affirm.

## I.

On February 26, 1988, in Chillicothe, Ohio, Raymond J. Pack, the superintendent of a vocational school, died as a result of petitioner's crashing his automobile into the automobile in which Pack was a passenger. The evidence shows that petitioner had been closely following another vehicle operating at the posted speed limit of 35 mph. Suddenly, however, petitioner swerved across the double yellow line that forbids passing along that section of Kopp Street and accelerated past the vehicle ahead of him. At a high rate of speed, estimated by an expert at 52 mph, petitioner collided with the vehicle in which Pack was riding, spinning it 360 degrees and knocking it up onto the sidewalk. That vehicle, operated by Mrs. Pack, had just entered Kopp Street from a side street.

Petitioner Stanley was charged with involuntary manslaughter and aggravated vehicular homicide. As clarified by a bill of particulars, the involuntary manslaughter count charged petitioner with proximately causing the death of Raymond Pack while committing or attempting to commit any of four misdemeanors; viz., speeding in violation of O.R.C. § 4511.21, reckless operation of a motor vehicle in violation of O.R.C. § 4511.20, operating a motor vehicle without reasonable control in violation of O.R.C. § 4511.202, and crossing a double yellow line in violation of O.R.C. § 4511.31. The first three offenses are classified as misdemeanors under Ohio law, the fourth as a minor misdemeanor.

The jury convicted petitioner of involuntary manslaughter and vehicular homicide, the lesser included offense of aggravated vehicular homicide. The trial court sentenced petitioner Stanley to incarceration for between two and ten years. The Ohio Court of Appeals affirmed the conviction on direct appeal, and the Ohio Supreme Court denied petitioner's motion for leave to appeal. Petitioner then brought this habeas action in the district court contending that his Fourteenth Amendment right to due process of law had been violated in that he was convicted of a felony that did not contain as one of its elements a culpable mental state. The district court entered judgment for defendant Warden Melody Turner, and this timely appeal followed.

## II.

We review a district court's ruling on a petition for habeas corpus de novo but with complete deference to such of the state court's findings of fact as are supported by the evidence. *Lundy v. Campbell,* 888 F.2d 467, 469 (6th Cir.1989), *cert. denied,* 495 U.S. 950, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). This case presents only questions of law.

■ Petitioner argues that the Ohio involuntary manslaughter statute violates the Due Process Clause of the Fourteenth Amendment unless it is construed to include the element of mens rea or some element of criminal intent that requires proof of a culpable mental state beyond strict liability. On its face, O.R.C. § 2903.04(B) does not specify a particular culpable mental state as an element of the crime. It provides:

* The Honorable Horace W. Gilmore, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit a misdemeanor.

There is no doubt but that Ohio, in enacting this law, elected to define involuntary manslaughter in terms of death caused by predicate offenses, thus intentionally rejecting the option of defining involuntary manslaughter in terms of reckless conduct. ·

As relevant to our inquiry, involuntary manslaughter at common law was an unexcused, unintentional homicide resulting from the commission of a criminal act not amounting to a felony nor naturally tending to cause death or great bodily harm. Clark & Marshall, Crimes (1952) 353–354, Section 262. Essentially, that common-law unlawful act manslaughter concept was carried forward in Ohio's statutory treatment of involuntary manslaughter until the adoption of the new criminal code in 1974.

When the new criminal code was introduced in the Ohio General Assembly, it included a reckless homicide provision as a substitute for the former statute which had punished conduct without reference to a specific culpable mental state. However, as the result of the legislative process, the reckless homicide provision was dropped in favor of a section retaining traditional unlawful act manslaughter concepts, in the form of the present involuntary manslaughter. statute. Goldsmith, Involuntary Manslaughter: Review and Commentary on Ohio Law (1979), 40 Ohio St.L.J. 569.

*State v. Losey*, 23 Ohio App.3d 93, 23 OBR 158, 491 N.E.2d 379, 381 (1985). The court in *Losey* went on to hold that the Ohio involuntary manslaughter statute was not unconstitutionally defective by virtue of a supposed failure to specify the degree of culpability necessary for conviction. It reasoned that the "criminal intent as an element of . . . involuntary manslaughter is supplied by the criminal intent to do the underlying unlawful act of which the homicide is a consequence," *id.,* 491 N.E.2d at 384, and concluded that the Ohio General Assembly meant to adopt this "traditional concept of transferred intent . . ." when it enacted the involuntary manslaughter statute. *Id.* Thus, the culpable mental state requisite to a conviction of involuntary manslaughter is the culpable mental state of the underlying misdemeanor.

In accordance with these principles, the trial court charged the jury that petitioner might be convicted of involuntary manslaughter if he "caused the death of Raymond J. Pack as a proximate result of committing one or more" of the misdemeanors specified in the indictment. J.A. 300. The court then properly defined the four underlying misdemeanors. Petitioner argues that this interpretation of the statute was deficient because it failed to instruct the jury that some level of criminal intent, i.e., something more than strict liability for committing a traffic misdemeanor, was required for conviction. Only one of the underlying misdemeanors, reckless operation of a motor vehicle (O.R.C. § 4511.20), contains such a level of criminal intent, and petitioner therefore contends that his conviction violates the Due Process Clause because it might rest on a jury finding that he was not guilty of reckless operation of a motor vehicle and was guilty only of speeding, crossing the double yellow line, or operating his vehicle without reasonable control. In essence, then, his argument is that misdemeanors for which a person may be strictly liable cannot support a conviction for involuntary manslaughter.

In support of this position, petitioner relies on *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), a criminal conversion case in which the Supreme Court held that a statutory enactment of a common law crime, though omitting the element of mens rea[1] from the express terms of the

---

**1.** The mental element of crime is known by many different terms.

[C]ourts of various jurisdictions, and for the purposes of different offenses, have devised working formulae, if not scientific ones, for the instruction of juries around such terms as "felonious intent," "criminal intent," "malice aforethought," "guilty knowledge," "fraudu-

lent intent," "wilfulness," "*scienter*," to denote guilty knowledge, or "*mens rea*," to signify an evil purpose or mental culpability. By use or combination of these various tokens, they have sought to protect those who were not blameworthy in mind from conviction of infamous common-law crimes.

*Morissette,* 342 U.S. at 252, 72 S.Ct. at 244.

offense, nevertheless is held to include that element because it was present in the common law formulation of the crime. In *Morissette*, however, the Court was careful to distinguish between statutory offenses derived from common law and more modern offenses designed to deter violations of public health, safety, and welfare laws. It recognized

a century-old but accelerating tendency, discernible both here and in England, to call into existence new duties and crimes which disregard any ingredient of intent. . . . Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. . . . Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare.

*Id.* at 253–54, 72 S.Ct. at 244–45. The Court also recognized that offenses designed to protect public health and safety need not contain "intent" as a necessary element.

While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities.

*Id.* at 256, 72 S.Ct. at 246.

Petitioner's argument, of course, is that if the underlying misdemeanors are safety statutes properly devoid of any element of criminal intent, then importing their intent into the involuntary manslaughter statute by means of the familiar principle of transferred intent results in the importation of no intent whatever. In petitioner's view, the outcome of this process is a felony statute that lacks *any* element of criminal intent or mental culpability. In a number of cases, the Supreme Court has approved federal penal statutes that punished conduct without regard to the offender's mental culpability or criminal intent. In *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Court reinstated a conviction for possession of unregistered hand grenades (26 U.S.C. § 5861(d)) over defendant's claim that the statute, which provided a penalty of up to ten years, did not require proof that defendant knew the hand grenades were unregistered. The Court admitted that the "Act require[d] no specific intent or knowledge that the hand grenades were unregistered," *id.* at 607, 91 S.Ct. at 1117, but, following the distinction in *Morissette* between penal statutes derived from the common law and those rooted in more recent public safety concerns, it nevertheless found the statute in question to be

a regulatory measure in the interest of the public safety, which may well be premised on the theory that *one would hardly be surprised to learn* that possession of hand grenades is *not an innocent act*. They are highly dangerous offensive weapons, no less dangerous than the narcotics involved in *United States v. Balint*, 258 U.S. 250, 254, 42 S.Ct. 301, 303, 66 L.Ed. 604 [ (1922) ], where a defendant was convicted of sale of narcotics against his claim that he did not know the drugs were covered by a federal act.

*Id.* 401 U.S. at 609, 91 S.Ct. at 1118 (emphasis added). The Court held that Congress had dispensed with any formal intent requirement regarding the unregistered status of the hand grenades.

The distinction between *Freed* and a case like *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), in which the Court struck down a city ordinance making it a crime for a convicted felon to remain in Los Angeles for more than five days without registering with the proper officials, is that being in Los Angeles is not "per se blamewor-

thy," and the failure to register is "unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." *Id.* at 228, 78 S.Ct. at 243. By contrast, "possession of hand grenades is not an innocent act." *Freed,* 401 U.S. at 609, 91 S.Ct. at 1118. Thus, where an offense is defined without a formal element of intent, and where the offense involves conduct for which one would not ordinarily be blamed, the Court might well find that a defendant could not be convicted of the offense without violating the Due Process Clause.

■ In *Lambert,* the defendant could not rationally have been presumed to know of the extraordinary registration requirement imposed by the city, and in *Morissette* the defendant could not be presumed to know that the government jealously guarded title to what appeared to be heaps of scrap bomb casings on lands hunted by the public. In *Freed,* however, defendant should have known that possession of hand grenades was likely to be regulated because grenades are "major weapons" unusual to the public. 401 U.S. at 616, 91 S.Ct. at 1121. Therefore, where a criminal statute prohibits and punishes seemingly innocent or innocuous conduct that does not in itself furnish grounds to allow the presumption that defendant knew his actions must be wrongful, conviction without some other, extraneous proof of blameworthiness or culpable mental state is forbidden by the Due Process Clause.[2]

■ On the other hand, where a criminal statute prohibits and punishes conduct not innocent or innocuous in itself, the criminal intent element may be dispensed with if the criminal statute is designed for the protection of the public health and safety and if it has no common law background that included a particular criminal intent. Because citizens are presumed to know the ordinary traffic safety laws and that violating them is dangerous and wrong, Ohio's involuntary manslaughter statute, as applied in this case, is based on the obviously wrongful and blameworthy conduct of violating traffic safety laws. Accordingly, it is not the kind of statute that requires a formally stated criminal intent element in order to comport with the Due Process Clause.

■ It is also possible to view the statute as one that does contain an appropriate element of criminal intent. We recognize that

Anglo–American law has developed several identifiable and analytically distinct levels of intent, *e.g., negligence,* recklessness, knowledge, and purpose. To determine the mental element required for conviction, each material element of the offense must be examined and the determination made what level of intent Congress intended the Government to prove, taking into account constitutional considerations as well as the common-law background, if any, of the crime involved.

*Freed,* 401 U.S. at 613–14, 91 S.Ct. at 1120 (Brennan, J., concurring) (emphasis added, citations omitted). Since the violation of the duty to obey the traffic safety laws is usually considered negligence per se, *Crawford v. State,* 57 Ohio St.3d 184, 566 N.E.2d 1233, 1240 (1991); *Mapes v. Opper,* 9 Ohio App.3d 140, 9 OBR 205, 458 N.E.2d 892, 895 (1983), the petitioner's commission of the underlying misdemeanors in this case means that he acted with a recognized criminal intent, *i.e.,* negligence. This may well be a low level of criminal intent, but it suffices for the crime of involuntary manslaughter. Indeed, in *Morissette,* the Supreme Court noted that involuntary manslaughter was usually defined as a crime involving negligence.

Most extensive inroads upon the requirement of intention, however, are offenses of *negligence,* such as *involuntary manslaughter* or criminal negligence and the whole range of crimes arising from omission of duty.

*Morissette,* 342 U.S. at 251 n. 8, 72 S.Ct. at 244 n. 8 (emphasis added). Thus, if involuntary manslaughter is a crime requiring a criminal intent of negligence only, then

---

2. This rule does not obtain in cases involving less serious infractions of regulatory statutes. A defendant may be held strictly liable for such conduct. *See United States v. Brandt,* 717 F.2d 955 (6th Cir.1983) (per curiam) (holding hunters may be convicted for hunting over a baited field although they had no knowledge of the baiting).

Ohio's statute does not violate the Due Process Clause because it requires proof of underlying misdemeanors involving negligence, if not recklessness.

Petitioner's reliance on *United States v. Wulff,* 758 F.2d 1121 (6th Cir.1985), is misplaced. In *Wulff* we stated:

> We are of the opinion that in order for one to be convicted of a felony under the MBTA [Migratory Bird Treaty Act], a crime unknown to the common law which carries a substantial penalty, Congress must require the prosecution to prove the defendant acted with some degree of scienter. Otherwise, a person acting with a *completely innocent state of mind* could be subjected to a severe penalty and grave damage to his reputation.

*Id.* at 1125 (emphasis added). *Wulff* obviously falls into the class of cases like *Lambert,* in which the defendant has no warning that his acts might be illegal. By contrast, petitioner in the present case is charged with knowledge of the traffic safety laws.

Petitioner's reliance on *United States v. Renner,* 496 F.2d 922 (6th Cir.1974), is also misplaced. *Renner* has been described as a "narrow holding," *United States v. Holloway,* 744 F.2d 527, 530 (6th Cir.1984), and has been limited to its facts. *United States v. Barrett,* 504 F.2d 629, 634 (6th Cir.1974), *aff'd,* 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976). *Renner* involved a federal prosecution for receiving firearms while under indictment. The defendant set up the defense that he did not know he was under indictment at the time of his receipt of the firearms. The unusual facts in *Renner,* where defendant was possibly misled by the apparent dismissal of an indictment against him, are nothing like the facts in this case.

Finally, the trial court properly instructed the jury that petitioner could be convicted only if the evidence showed beyond a reasonable doubt that petitioner "caused the death of Raymond J. Pack as a proximate result of committing one or more of the following traffic offenses: One, Speeding, two, Reckless Operation, three, Operating a Motor Vehicle without Reasonable Control and four, a violation of Section 4511.31 of the Ohio Law entitled Hazardous Zones." J.A.

300–01. Because the crime of involuntary manslaughter is a crime of transferred intent under Ohio law, *Losey,* 491 N.E.2d at 384, the jury needed only to find that petitioner's commission of one or more of the underlying misdemeanors caused the victim's death. Petitioner does not contend that the trial court erred in defining any of the misdemeanors, and the jury was, therefore, properly instructed on the mental element required for conviction under Ohio's involuntary manslaughter statute.

### III.

For the reasons stated, the judgment of the district court dismissing petitioner's petition for a writ of habeas corpus is AFFIRMED.