BONDS, Appellant,

v.

## DEPARTMENT OF REHABILITATION AND CORRECTION.

[Cite as *Bonds v. Ohio Dept. of Rehab. & Corr.* (1996), 116 Ohio App.3d 144.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 96API04–516.

Decided Dec. 3, 1996.

*Dean A. Young* and *Mark W. Ruf*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Susan M. Sullivan*, Assistant Attorney General, for appellee.

LAZARUS, Judge.

Plaintiff-appellant, Beulah Bonds, appeals from a judgment of the Court of Claims in favor of defendant-appellee, the Ohio Department of Rehabilitation and Correction ("DRC"). We affirm for the reasons that follow.

On March 17, 1992, Walter Howard Sayre burglarized appellant's Summit County home and raped her. Appellant alleges that her injuries were proximately caused by the negligence of DRC, which released Sayre from the Lorain Correctional Institution ("LCI") on February 21, 1992. Appellant alleges that releasing Sayre was negligent because DRC had received and was aware of a detainer from the state of Florida and because DRC miscalculated Sayre's release date and released him early. The issue of liability was tried on stipulated facts and exhibits. The court found that DRC owed appellant no duty and that DRC correctly calculated Sayre's release date. Appellant asserts two assignments of error:

"I. The trial court erred as a matter of law in not finding that there was an intervening justification for Walter Sayre's confinement because there was a valid

demand for extradition pursuant to R.C. 2963.03, Florida notified Ohio of its intent to extradite Sayre, and the waiver of extradition waived the procedural requirements for extradition.

"II. The trial court erred as a matter of law in holding that the Lorain Correctional Institution properly calculated the time for good behavior."

On October 21, 1991, Akron police arrested Sayre for drug trafficking and conducted a "wants and warrants" search on the nationwide Law Enforcement Automated Data System ("LEADS"). As a result of this computer inquiry, the Osceola County, Florida, Sheriff's Office on October 30, 1991, sent Akron police a teletype identifying Sayre by name and Social Security Number. The text of the teletype read:

"WE HOLD ACTIVE WARRANT # CR91717 FTA/CTI FORGERY, CTI UTTERING A FORGERY. THERE IS NO BOND. PLEASE PLACE A HOLD FOR THIS AGENCY AND ADVISE WHEN HOLD HAS BEEN PLACED. WE WILL EXTRADITE. PLEASE ACKNOWLEDGE RECEIPT OF THIS TELETYPE. THANK YOU."

An Akron police detective acknowledged the teletype and obtained a fugitive warrant compelling Sayre's appearance in court for purposes of commencing extradition proceedings.

On December 19, 1991, Sayre appeared before the Akron Municipal Court and in the presence of his attorney signed a "waiver of extradition" form. By signing the form, Sayre consented to return to Osceola County, Florida, without formal extradition proceedings. On the same form, the judge signed the following order:

"The above named fugitive having been arraigned before this Court and having been informed of his rights to demand extradition and the said fugitive having indicated a willingness to return to the State of Florida and having excuted [sic] a waiver of extradition now, therefore, it is ordered and directed that the said fugitive be delivered and surrendered to the authorized agent of the demanding State."

That same day, Akron police sent the Osceola County Sheriff the following teletype:

"REF: Sayre, Walter H DOB 111470, subject appeared in court this date and signed a waiver of extradition. Information will be forwarded to the Summit Co. S.O. to be placed in his file. Subject still has felony case pending. Futher [sic] communication ref subject should be through the Summit Co S.O..[sic] If we may be of further assistance please advise."

On December 26, 1991, Sayre pled guilty in the Summit County Court of Common Pleas to trafficking in marijuana. On January 22, 1992, while still in the

custody of the Summit County Sheriff, Sayre was sentenced to six months in LCI. The court's journal entry also ordered that Sayre be given credit for time served. The Summit County Sheriff issued a "Verification of Booking Date" form showing that Sayre had served ninety-nine days in jail, from October 21, 1991 to January 27, 1992.

On January 27, 1992, the Summit County Sheriff conducted another LEADS search to verify the status of any pending charges against Sayre. The Osceola County Sheriff sent the Summit County Sheriff a teletype reading: "IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI." That same day, the Summit County Sheriff delivered custody of Sayre to DRC at LCI and also delivered copies of the following documents, which DRC employees at LCI reviewed and placed in Sayre's master file: the October 30, 1991 teletype from Osceola County; the form bearing the waiver of extradition and court order; the court's judgment entry of conviction and sentence; the verification of booking form; and the January 27, 1992 teletype from Osceola County. Also on January 27, 1992, DRC determined Sayre's release date to be February 21, 1992, based on the following calculation:

| | |
|---|---|
| Six-month definite sentence | 182.5 days |
| Less time off for good behavior pursuant to R.C. 2967.19 (182.5 × 30%) | − 54.75 |
| Less time served in Summit County Jail | − 99 |
| Time to be served | 28.75 days |

The twenty-eighth day from January 27, 1992, was Sunday, February 23, 1992. Because DRC's policy was to not release prisoners during a weekend, Sayre's release date was Friday, February 21, 1992.

DRC released Sayre as scheduled on February 21, 1992. DRC did not treat the documents it had received as constituting a detainer, did not prepare a Form 940–1, and had no further contact with the authorities in Florida, the Akron police, the Summit County Sheriff, or the Akron Municipal Court. On March 17, 1992, Sayre burglarized appellant's Summit County home and raped her.

■ In the second assignment of error, appellant argues that if DRC had calculated Sayre's release date correctly, he would not have been released until March 26, 1992, and he would have been in prison on the day that he attacked appellant. Appellant argues that March 26, 1992, was the correct release date because Sayre should have been credited with twenty-five days for good time rather than 54.75 days: appellant argues that Sayre's good time should have been calculated as thirty percent of 83.5 days (Sayre's 182.5–day sentence less ninety-nine days time served).

Sayre's good time was properly calculated based on his sentence. R.C. 2967.19 provides:

"(A) Except as provided in division (F) of this section, a person confined in a state correctional institution is entitled to a deduction from his minimum or definite sentence of thirty per cent *of the sentence,* prorated for each month of the sentence during which he faithfully has observed the rules of the institution. Any deduction earned under this division shall be credited to the person pursuant to division (E) of this section.

" * * *

"(E) The thirty per cent diminution *of a prisoner's sentence* that is provided in divisions (A), (B), and (C) of this section and the diminution of a prisoner's sentence that is provided in division (D) of this section shall be prorated on a monthly basis and shall be credited to each prisoner at the expiration of every calendar month. * * * " (Emphasis added.)

R.C. 2967.19 provides that good time is calculated based on the sentence, not the sentence less time served. See *State ex rel. Mishler v. Clark* (Apr. 18, 1978), Franklin App. No. 77AP–826, unreported (decided under prior version of R.C. 2967.19). Therefore, DRC correctly calculated Sayre's good time. The second assignment of error is not well taken.

Under the first assignment of error, appellant argues that DRC was negligent *per se* for violating constitutional, statutory, and administrative-rule duties arising from the detainer filed by the Osceola County Sheriff and Sayre's waiver of extradition.

■ The doctrine of negligence *per se* is inapplicable in this case. A court applies the doctrine by recognizing a statute or administrative rule as fixing a standard of conduct deviation from which constitutes negligence. See Prosser & Keeton, Law of Torts (5 Ed.1984) 220, 230, Section 36. In other words, the statute or rule establishes the standard of conduct, thereby replacing in most cases the "reasonable person" standard.

The Supreme Court of Ohio described the doctrine of negligence *per se* in *Hurst v. Ohio Dept. of Rehab. & Corr.* (1995), 72 Ohio St.3d 325, 327, 650 N.E.2d 104, 106:

"We have held that '[w]here there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se.' *Eisenhuth v. Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440, paragraph three of the syllabus.

"However, where the duty is defined 'only in abstract or general terms, leaving to the jury the ascertainment and determination of reasonableness and correctness of acts and conduct under the proven conditions and circumstances, the

phrase negligence *per se* has no application.' *Swoboda v. Brown* (1935), 129 Ohio St. 512, 523, 2 O.O. 516, 521, 196 N.E. 274, 279. In *Eisenhuth* we further explained that where the duty prescribed by the enactment is so specific that the only determination necessary by the jury is to find but a single fact, a violation of the statute, then there is negligence *per se.* Conversely, if the jury must determine negligence from a consideration of several facts and circumstances, then negligence *per se* is inapplicable. *Id.*, 161 Ohio St. at 373–374, 53 O.O. at 277–278, 119 N.E.2d at 444."

The court in *Hurst* described the duties that give rise to negligence *per se* as "specific affirmative duties." *Id.* at 329, 650 N.E.2d at 107; *id.* at 327, 650 N.E.2d at 106, (describing *Crawford v. Ohio Div. of Parole & Community Serv.* [1991], 57 Ohio St.3d 184, 566 N.E.2d 1233, and *Reynolds v. State* [1984], 14 Ohio St.3d 68, 14 OBR 506, 471 N.E.2d 776). See *Mussivand v. David* (1989), 45 Ohio St.3d 314, 319, 544 N.E.2d 265, 271 (holding that because R.C. 3701.81[A]—"No person, knowingly or having reasonable cause to believe that he is suffering from a dangerous, contagious disease, shall knowingly fail to take reasonable measures to prevent exposing himself to other persons, except when seeking medical aid"— does not describe a specific act, its violation does not constitute negligence *per se* ); *Reed v. Molnar* (1981), 67 Ohio St.2d 76, 80, 423 N.E.2d 140 (holding that because statute providing that owners of certain domestic animals shall not permit them to run at large in the public road does not impose a requirement of an absolute and specific nature, doctrine of negligence *per se* is inapplicable). The doctrine of negligence *per se* is applicable only when the purpose of the statute or rule is to protect a class of persons to which the plaintiff belongs from the risk of the type of injury the plaintiff suffered:

"Negligence *per se* is a legal doctrine that presumes negligence where a statute that provides a standard of care to protect a class of persons from a particular risk is violated. But the presumption arises only when the violation results in the type of injury that the statute was designed to protect against. Prosser & Keeton, Law of Torts (5 Ed.1984) 223–227, Section 36. * * *

"Negligence *per se* is appropriate only for statutes that impose a standard of care the breach of which may fairly be presumed to be negligent. * * * " *Crawford, supra*, 57 Ohio St.3d at 191, 566 N.E.2d at 1240 (Wright, J., dissenting).

See *Hernandez v. Martin Chevrolet, Inc.* (1995), 72 Ohio St.3d 302, 649 N.E.2d 1215 (holding that violation of an OSHA regulation does not constitute negligence *per se*, because OSHA regulations are not intended to affect the duties owed for the safety and protection of others); *Beaver v. H. Zussman & Son Co.* (1988), 47 Ohio App.3d 69, 70, 546 N.E.2d 1359, 1360 (holding that because purpose of Cincinnati Fire Prevention Code provision requiring that all fire escapes be

maintained in a safe and proper operating condition was not to protect police officers electing to use fire escape ladder in the performance of official duty, violation of the fire code provision does not constitute negligence *per se* ).

Appellant and the dissent collectively argue that DRC violated nine duties to which the doctrine of negligence *per se* applies.

■ First, appellant argues that DRC was negligent *per se* for violating its duty under Article V(a) of the Interstate Agreement on Detainers ("IAD"), R.C 2963.30 to 2963.35,[1] to offer to deliver custody of Sayre to Florida officials. Article V(a) of the IAD provides:

"In response to a request made under Article III [a request by the prisoner] or Article IV [a request by the receiving state] hereof, the appropriate authority in a sending state shall offer to deliver temporary custody of such prisoner to the appropriate authority in the state where such indictment, information or complaint is pending against such person in order that speedy and efficient prosecution may be had. * * * "

The preliminary issue is whether Sayre was the subject of "a request made under Article IV." Article IV(a) provides:

"The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with Article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated: *provided that the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request:* and provided further that there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner." (Emphasis added.) Article IV(a) of the IAD, R.C. 2963.30; see, also, Agreement on Detainers Form V: Request for Temporary Custody, reprinted in Handbook on Interstate Crime Control, *supra*, at 106, fn. 1.

The only documents received by DRC were teletypes from the Osceola County, Florida, Sheriff's Office. Although these teletypes constitute a detainer, because they do not constitute a request for temporary custody "approved, recorded and

---

1. The suggested enabling legislation and text of the IAD are reprinted in Council of State Governments, Handbook on Interstate Crime Control (Rev.Ed.1966) 92–98.

transmitted" by a Florida court, they do not constitute "a request made under Article IV" of the IAD. Therefore, the IAD is inapplicable.

 Even if the IAD were applicable to Sayre such that DRC was mandated to offer to deliver Sayre to Florida officials pursuant to Article V(a) of the IAD, violation of this mandate would not constitute negligence *per se*. The doctrine of negligence *per se* applies only to the types of injury that the statute or rule was designed to protect against. The IAD's primary purpose is not to protect against recidivist criminals. The IAD's purpose is to protect prisoners against groundless and bad-faith detainers. "[A] primary purpose of the Agreement is to protect prisoners against whom detainers are outstanding." *Cuyler v. Adams* (1981), 449 U.S. 433, 449, 101 S.Ct. 703, 712, 66– L.Ed.2d 641, 654; see *Carchman v. Nash* (1985), 473 U.S. 716, 729–730, 105 S.Ct. 3401, 3408–3409, 87 L.Ed.2d 516, 526–527. The IAD states its purpose in more specific terms:

"The party states find that charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trials of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party states and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints. The party states also find that proceedings with reference to such charges and detainers, when emanating from another jurisdiction, cannot properly be had in the absence of cooperative procedures. It is the further purpose of this agreement to provide such cooperative procedures." Article I of the IAD, R.C. 2963.30.

" * * * The IAD's primary purpose is not to protect prosecutors' calendars, or even to protect prosecutions, but to provide a swift and certain means for resolving the uncertainties and alleviating the disabilities created by outstanding detainers." *Fex v. Michigan* (1993), 507 U.S. 43, 55, 113 S.Ct. 1085, 1092, 122 L.Ed.2d 406, 417.

See *Carchman, supra,* 473 U.S. at 720, 105 S.Ct. at 3403–3404, 87 L.Ed.2d at 520–521; *United States v. Mauro* (1978), 436 U.S. 340, 351, 98 S.Ct. 1834, 1842–1843, 56 L.Ed.2d 329, 341. "The primary emphasis of the proponents of the Agreement was on the anti-rehabilitative effect of longstanding detainers." *Ridgeway v. United States* (C.A.6, 1977), 558 F.2d 357, 362, certiorari denied (1978), 436 U.S. 946, 98 S.Ct. 2850, 56 L.Ed.2d 788. Because the purpose of the

IAD is not to protect against the injury appellant suffered,[2] the doctrine of negligence *per se* does not apply to Article V(a) of the IAD.[3]

 Second, appellant argues that DRC was negligent *per se* for violating its duty under Article V(d) of the IAD to hold Sayre in a suitable jail or other facility. Article V(d) provides:

"The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations or complaints which form the basis of the detainer or detainers or for prosecution on any other charge or charges arising out of the same transaction, except for his attendance at court and while being transported to or from any place at which his presence may be required, the prisoner shall be held in a suitable jail or other facility regularly used for persons awaiting prosecution."

The doctrine of negligence *per se* is inapplicable to Article V(d) because (1) the detainer against Sayre did not constitute a request made under Article IV(a); (2) the purpose of the IAD is not to protect against the injury appellant suffered; and (3) Article V(d) is addressed not to sending states but to receiving states having temporary custody pursuant to the IAD.

Third, appellant cites R.C. 2963.32 as creating a duty to effectuate the IAD. R.C. 2963.32 is a modified version of suggested enabling legislation contained in Section 3 of the model IAD.[4] R.C. 2963.32 directs that Ohio officials "shall do all things that are necessary to effectuate" the IAD. For the reasons described above, the IAD does not apply in this case.

---

**2.** Not only does the IAD not create a duty on the part of the custodian to act on the behalf of the public, it does not create even a duty to act on the behalf of the state filing the detainer. The IAD does not require that the state having custody of the prisoner make the prisoner available to the requesting state. Article IV(a) provides:

"* * * [T]here shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner."

Under the IAD, "a Governor's right to refuse to make a prisoner available is preserved." S.Rep. No. 1356, 91st Cong. (1970), reprinted in 1970 U.S.C.C.A.N. 4864, 4865. The General Assembly declined to adopt that portion of the suggested enabling legislation of IAD Section 6, which provides: "It shall be lawful and mandatory upon the warden or other official in charge of a penal or correctional institution in this state to give over the person of any inmate thereof whenever so required by the operation of the Agreement on Detainers." IAD, Section 6, reprinted in Handbook on Interstate Crime Control, *supra*, at 93, fn. 1.

**3.** Research reveals no case in any jurisdiction discussing the IAD and negligence *per se*.

**4.** See footnote 1, *supra*.

Fourth, a finding of negligence *per se* cannot be based on Ohio Adm.Code 5120:1–1–33(B). Ohio Adm.Code 5120:1–1–33 provides:

"(A) No inmate shall be released from an institution when a detainer has been placed against such resident * * * except pursuant to this Administrative Regulation and:

"(1) Interstate Compact on Detainers Procedures, Section 2963.35, Revised Code;

"(2) Intrastate Agreement on Detainers Procedures, Section 2941.401, Ohio Revised Code.

"(B) At least thirty (30) days prior to the scheduled release of any such inmate, notification of the pending release date shall be communicated to the authority that placed the detainer on Form 940–1. * * * "

Because neither the IAD nor the Intrastate Agreement codified at R.C. 2941.401 applies in this case, Ohio Adm.Code 5120:1–1–33 does not apply.

Fifth, appellant argues that DRC was negligent *per se* for violating its duty under R.C. 2963.24, which provides for the accused's waiver of extradition proceedings. Appellant relies on the following italicized language in that statute:

"When such consent [the accused's consent to return to the demanding state] has been executed it shall forthwith be forwarded to the office of the governor and filed therein. *The judge shall direct the officer having such person in custody to deliver forthwith such person to the accredited agent of the demanding state,* and shall deliver to such agent a copy of such consent. This section does not limit the rights of the accused person to return voluntarily and without formality to the demanding state before any such demand has been made, nor is this waiver procedure an exclusive procedure or a limitation on the powers, rights, or duties of the officers of the demanding state or of this state." (Emphasis added.) R.C. 2963.24.

For two reasons, the doctrine of negligence *per se* does not apply to this sentence in this case.

First, the purpose of this sentence is not to protect a class of persons to which appellant belongs from the risk of the type of injury she suffered. This sentence is merely directory language under which the judge performs the ministerial act of issuing an official order to the officer having custody of the accused to deliver the accused to the officer of the demanding state. It does not establish a standard of care cognizable under the doctrine of negligence *per se.*

Second, even if the doctrine of negligence *per se* were applicable to this sentence, the directive of this sentence was not violated in this case. The fact that this sentence calls for the custodian to deliver the fugitive "forthwith" to the

agent of the demanding state does not mean that it creates a duty on the part of Ohio to transport the prisoner to the demanding state.

██ " * * * Pursuant to R.C. 2963.24, where a fugitive waives extradition, it is the duty of this state (the asylum state) to notify the demanding state of the waiver and to deliver the fugitive 'to the accredited agent of the demanding state.' In order to complete the transfer, the demanding state must provide an accredited agent. If it does not, the extradition fails to take place." *State v. King* (Jan. 18, 1995), Lorain App. No. 93CA–005583, unreported, 1995 WL 19192.

Akron police fulfilled Ohio's responsibility as the asylum state to notify Florida of Sayre's waiver of extradition procedures. The day of the waiver, Akron police sent the Osceola County Sheriff a teletype giving notice of the waiver, informing that Sayre had a felony case pending and asking that further communication be through the Summit County Sheriff's Office. Therefore, R.C. 2963.24 was not violated.

██ Sixth, appellant argues that DRC was negligent *per se* for violating its duty under R.C. 2963.02, which provides:

"Subject to sections 2963.01 to 2963.27, inclusive, of the Revised Code, the constitution of the United States and all acts of congress enacted in pursuance thereof, the governor shall have arrested and delivered to the executive authority of any other state of the United States, any person charged in that state with treason, felony, or other crime, who has fled from justice and is found in this state."

R.C. 2963.02 is the introductory language of R.C. Chapter 2963 on extradition, and it sets forth only a general duty on the part of the Governor to comply with the extradition statutes. The duty expressed is a duty "[s]ubject to sections 2963.01 to 2963.27, inclusive, of the Revised Code." R.C. 2963.02 does not express a specific duty; indeed, it could hardly be more general.

██ Seventh, appellant argues that DRC was negligent *per se* for violating its duty under Clause 2, Section 2, Article IV of the United States Constitution, which provides:

"A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

This provision does not establish a duty sufficiently specific to warrant application of the doctrine of negligence *per se.*

■ Eighth, appellant cites R.C. 5145.04 as creating a duty to confine Sayre. R.C. 5145.04 provides: "The department of rehabilitation and correction shall maintain the control over prisoners committed to its custody that prevents them from committing crime, secure their self-support, and accomplish their reformation." Because DRC released Sayre upon the expiration of his sentence, and because Sayre was not a DRC prisoner at the time he attacked appellant, R.C. 5145.04 is inapplicable.

Ninth, appellant cites R.C. 2963.13 as requiring the judge to commit the fugitive to the county jail pending extradition. Appellant provides no analysis on this point, and R.C. 2963.13 does not support her claim.

■ Thus, even assuming that DRC violated these various mandates, none of them are duties to which the doctrine of negligence *per se* applies. There remains the question of whether DRC owed appellant a duty actionable under ordinary principles of negligence, including the public duty rule. See *Hurst, supra*, 72 Ohio St.3d at 328–329, 650 N.E.2d at 106–108.

■ "The public duty rule comprises a defense independent of sovereign immunity. *Sawicki [v. Ottawa Hills* (1988) ]*,* 37 Ohio St.3d 222, 525 N.E.2d 468, paragraph three of the syllabus. The rule originated in English common law and survived the abrogation of sovereign immunity. *Id.* at 229–230, 525 N.E.2d at 476–477. It is used to determine the first element of negligence, the existence of a duty on the part of the state. If the duty owed is general in nature, the wrong created by its breach is to the public in general and, therefore, not individually actionable. *Id.* at 230, 525 N.E.2d at 477, citing 2 Cooley, Law of Torts (4 Ed.1932) 385–386, Section 300." *Hurst, supra,* at 329, 650 N.E.2d at 107.

The public duty rule protects government entities from liability arising from a "public duty," as opposed to a "special duty."

"When a duty which the law imposes upon a public official is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, is generally a public and not an individual injury." *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468, paragraph two of the syllabus.

■ "In order to demonstrate a special duty or relationship, the following elements must be shown to exist: (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Id.* at paragraph four of the syllabus.

The public duty rule applies to uniquely governmental functions.[5] Managing prisons—the conduct at issue here—is a uniquely governmental function to which the public duty rule applies.

Application of the public duty rule is even more apposite in this case than it was in *Hurst*. In *Hurst*, the plaintiff alleged wrongful death, negligence, and negligence *per se* against DRC for its delay in processing a Parole Violator at Large ("PVAL") report regarding a parolee who was absent without leave from his assigned halfway house. The parolee allegedly participated in the beating death of plaintiff's decedent. Between the time the parolee fled the halfway house and the time of the murder, the parolee was incarcerated in Allen County for twenty days on a charge of driving under the influence. Had the PVAL report been timely processed and entered into law enforcement computer databases, Allen County officials presumably would have informed DRC that they had custody of the parolee, the parolee would not have been released, and the murder would not have occurred. The Supreme Court first held that the doctrine of negligence *per se* was inapplicable to the statutes and rules cited by the plaintiff. *Id.*, 72 Ohio St.3d at 327–328, 650 N.E.2d at 106–107. The court then considered the case under ordinary principles of negligence and determined that under the public duty rule, DRC owed the plaintiff no duty. In *Hurst*, the tortfeasor was a prisoner whom the DRC had discretion to parole or hold in prison. Here, in contrast, because Sayre had completed his sentence, DRC was required to

---

5. See, *e.g.*, *Hurst, supra*, at 329, 650 N.E.2d at 107–108 (administration of prisoner parole); *Ashland Cty. Bd. of Commrs. v. Ohio Dept. of Taxation* (1992), 63 Ohio St.3d 648, 654–655, 590 N.E.2d 730, 735–736 (certification to county auditors of apportionment of value of taxable property); *Anderson v. Ohio Dept. of Ins.* (1991), 58 Ohio St.3d 215, 218–219, 569 N.E.2d 1042, 1044–1046 (liquidation of health maintenance organizations); *Williamson v. Pavlovich* (1989), 45 Ohio St.3d 179, 543 N.E.2d 1242, paragraph three of the syllabus (enforcement of parking ordinances); *Commerce & Industry Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 543 N.E.2d 1188 paragraph four of the syllabus (firefighting protection); *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 2, 534 N.E.2d 835, 835–836 (home inspections); *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 232, 525 N.E.2d 468, 478–479 (police protection); *Grothouse v. Ohio Dept. of Health* (1992), 80 Ohio App.3d 258, 263–264, 608 N.E.2d 1183, 1186–1187, (destruction of birth records after adoption); *Lewis v. Ohio Dept. of Health* (1990), 66 Ohio App.3d 761, 762–764, 586 N.E.2d 182, 183–185 (inspection and licensing of nursing homes); *Miller v. Canale* (1990), 66 Ohio App.3d 367, 370, 584 N.E.2d 57, 59, (licensing of taxicab drivers); *Shelton v. Greater Cleveland Reg. Transit Auth.* (1989), 65 Ohio App.3d 665, 676–677, 584 N.E.2d 1323, 1330–1331 (transit authority police protection), jurisdictional motion overruled (1990), 52 Ohio St.3d 701, 556 N.E.2d 525, certiorari denied, 498 U.S. 941, 111 S.Ct. 349, 112 L.Ed.2d 313; *CSX Transp., Inc. v. Pub. Util. Comm.* (1989), 64 Ohio App.3d 10, 16, 580 N.E.2d 496, 500 (surveys of public railroad crossings); *Metzger v. Supt. of Bldg. & Loan Assns.* (1986), 31 Ohio App.3d 212, 213, 31 OBR 482, 482–483, 510 N.E.2d 404, 405–406 (regulation of savings and loan institutions); *Zebrasky v. Dept. of Transp.* (1984), 16 Ohio App.3d 481, 484, 16 OBR 564, 566–567, 477 N.E.2d 218, 220–221 (police protection); *Epling v. Cardarelli* (1983), 13 Ohio App.3d 142, 145, 13 OBR 175, 177–178, 468 N.E.2d 335, 338 (police protection); *Shelton v. Indus. Comm.* (1976), 51 Ohio App.2d 125, 131, 5 O.O.3d 286, 289–290, 367 N.E.2d 51, 54 (workplace inspections).

release him. Because DRC did not owe appellant a special duty within the meaning of the public duty rule, DRC did not owe appellant any duty actionable under ordinary principles of negligence.

Because DRC owed no duty to appellant under either the doctrine of negligence *per se* or ordinary principles of negligence, the first assignment of error is not well taken.

For the foregoing reasons, both of appellant's assignments of error are overruled, and the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

PETREE, P.J., concurs.

TYACK, J., dissents.

TYACK, Judge, dissenting.

I respectfully dissent.

Walter H. Sayre was arrested on October 21, 1991. Less than ten days later, the sheriff's office in Osceola County, Florida, notified Akron police that it held an active arrest warrant on Mr. Sayre and that it wished for Mr. Sayre to be extradited to Florida. As a result, Akron police obtained a fugitive warrant for Mr. Sayre and caused him to be brought into court. Mr. Sayre waived extradition proceedings, and a judge then ordered that he be delivered and surrendered to Florida authorities.

In January 1992, Mr. Sayre was given a six-month, definite sentence of imprisonment and was conveyed into the custody of the Ohio Department of Rehabilitation and Correction ("DRC"). The DRC then made the same mistake made by a majority of this panel when it ignored the portion of former R.C. 2967.19 which granted good time " * * * prorated for each month of the sentence during which he [the inmate] faithfully has observed the rules of the institution. * * * " Mr. Sayre did not faithfully observe the rules of any institution before his arrival in the custody of the DRC, so did not begin earning good-time credit until he arrived in the custody of the DRC. I do not believe that former R.C. 2967.19(A) can justifiably be construed to emphasize three words but to ignore the qualifying language which limits good time to time when an inmate exhibits good behavior in an institution.

I would sustain the first assignment of error.

As to the second assignment of error, I am even more troubled. To me, the majority opinion says that the DRC can escape liability for its actions when it ignores a valid court order compelling extradition of a prisoner and even ignores

its obligation to notify the state who is entitled to receive the prisoner when the prisoner will be available.

Applying either a negligence *per se* standard or a reasonable person standard, the result should be the same. DRC should retain in custody those who it has been ordered to retain and should both notify a state which is seeking extradition of the date an inmate will be available and surrender the inmate to the authorities of that state at the appropriate time. Failure to do so is a violation of statute, of the Ohio Administrative Code, and of the duties of a reasonable system of corrections. To me, the majority opinion strains to relieve DRC of responsibility for this common sense, minimal requirement.

I note that Mr. Sayre agreed to be extradited and a court ordered that he be extradited. He was not extradited.

I note that the Ohio Administrative Code at 5120:1-1-33(B) requires that notice be given of the pending release date of an inmate who is subject to a detainer. No notice was given.

I note R.C. 2963.24 directs that an inmate who has been ordered to be extradited be delivered to the state seeking extradition. Mr. Sayre was not delivered.

Perhaps the greatest concern to me is the fact that the majority opinion utterly ignores the ruling of a five-person majority of the Supreme Court of Ohio in *Crawford v. Ohio Div. of Parole & Community Serv.* (1991), 57 Ohio St.3d 184, 566 N.E.2d 1233. Instead, the majority opinion quotes as if it were precedent the statement in the dissent of a single justice about the extent of the applicability of negligence *per se*. I find this reliance upon a statement about a legal principle which was clearly rejected by a five-person majority of the Supreme Court of Ohio to be utterly incomprehensible.

The Supreme Court of Ohio's subsequent opinion in *Hurst v. Ohio Dept. of Rehab. & Corr.* (1995), 72 Ohio St.3d 325, 650 N.E.2d 104, is also clearly consistent with the majority opinion in the *Crawford* case and inconsistent with the ruling in the majority opinion. I restate part of the quote in the majority opinion above:

"We have held that '[w]here there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se.' *Eisenhuth v. Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440, paragraph three of the syllabus."

I note that the focus is upon the specificity of the duty, not upon who ultimately was injured. In the case of Beulah Bonds, the duties are quite specific. The DRC was required to notify Florida of when Mr. Sayre would be available and

was required to surrender Mr. Sayre to Florida authorities at that time. Such duties are not defined in abstract or general terms, but are clear duties capable of being adjudicated by determination of a single fact.

The clear danger of the majority opinion's disregard of the holdings of the Supreme Court of Ohio in the *Crawford* and *Hurst* cases is that law-abiding citizens can have no remedy for the failure of state authorities to confine inmates who the state authorities have a clear duty to confine and extradite. The majority opinion simply says that the doctrine of negligence *per se* is to protect a "class of persons" different from the class of people of which Beulah Bonds is a member, which to me means the class consisting of law-abiding citizens generally. Instead, according to the majority opinion, the only people who can sue the state when an inmate who is supposed to be confined rapes an innocent woman are members of some other, undefined "class of persons."

In short, I believe that the DRC had a duty to confine Mr. Sayre until he had completed his sentence, to notify Florida of the date his sentence was to be completed, and to surrender him to Florida on that date. The failure to perform any of those duties, let alone all three, constitutes negligence for which the DRC should be held liable. Since a majority of this panel reaches a different conclusion, I respectfully dissent.