OPINION
This is an appeal by plaintiffs from a judgment of the Ohio Court of Claims rendered in favor of defendant, Ohio Department of Commerce, Division of State Fire Marshal, on plaintiffs' negligence action.
On December 29, 1999, plaintiffs, John Wallace, Willa D. Wallace, Nancy G. Tolliver, Willie Workman, Zilla Joan Sansom, Clyde R. Sansom, Linda Carmon, Charles Cooper, Gregory Lee, Paul Wilks, Marcia S. Garrett, Richard Pruitt, Rhonda Ferguson and Amy Pruitt, filed a complaint in the Court of Claims against defendant. Plaintiffs' complaint alleged that, on July 3, 1996, plaintiffs and/or their decedents were patrons and invitees on the premises of a fireworks store located at State Route 217, Scottown, Ohio, operated by Flying Dragon, Inc., d.b.a. The Ohio River Fireworks Company. The complaint alleged that, on that date, a fire was "allowed to start in fireworks that were openly displayed" in the store. Plaintiffs alleged that, pursuant to R.C. 3737.22 and 3743.01et. seq., defendant had certain powers, duties, obligations and responsibilities with respect to manufacturers, suppliers, wholesalers and retailers of fireworks. Plaintiffs further alleged that defendant negligently and carelessly failed to exercise reasonable and ordinary care with respect to those powers, duties, obligations and responsibilities, resulting in death or injury to plaintiffs or their decedents.
By entry filed September 2, 1998, the trial court bifurcated the issues of liability and damages for trial. The matter came for trial before the Court of Claims beginning on March 15, 1999.
The following facts are drawn primarily from the trial court's decision, which comprehensively sets forth the factual background of the case and the basis of the court's decision. At the time of the incident, Flying Dragon, Inc., was licensed as a wholesaler of fireworks pursuant to R.C. 3743.16. The wholesaler license is the only type of fireworks sales license issued by the state and, during the time period at issue, such license permitted its holder to sell both "Class C" and "Class B" fireworks. Class C fireworks are common "backyard fireworks," intended for use by the general public, while Class B fireworks contain greater amounts of explosive material and can only be sold to licensed exhibitors for use at public fireworks exhibitions.
The Ohio River Fireworks Company was located on a hill in a rural area of Lawrence County. The store consisted of a thirty-two by forty-foot concrete block building, with a concrete floor and a metal roof supported by wooden rafters. The main entrance door and two windows were located on the front wall, while a second door was located at the rear of the store. The interior walls contained wooden storage shelves, while three additional rows of metal shelves created four aisles within the store. The main showroom building was used for the sale of Class C fireworks to the general public, and additional storage for Class C fireworks was provided by six trailers parked along the east side of the store. Class B fireworks were stored in a separate building located southwest of the main building.
The main building had a "full suppression" overhead sprinkler system that received water from an elevated pond located on a hill behind the store. A valve located inside the store on the back wall manually controlled water flow to the sprinkler system. A pressure gauge in the northwest corner of the building displayed the static water pressure in the sprinkler system. The trial court found that "[t]he sprinkler system's control valve had been turned off some time prior to the fire, rendering it inoperable."
On the date of the incident, Richard Pruitt, a store employee, observed Todd Hall and three other individuals walk through the entrance gate and approach the store. When Hall walked into the store, another employee working at an outside cash register shouted to Pruitt that this individual was carrying a lit cigarette. Pruitt followed Hall into the store and observed Hall standing next to a stack of "crackling wheel" fireworks that were displayed on a shelf near the northwest corner of the building. Pruitt then observed Hall use the cigarette to light the fuse of a firework, causing the firework to immediately begin emitting sparks. Pruitt shouted at Hall to stop, and Pruitt attempted to extinguish the exploding fireworks by "stomping" on them. During this time, Hall exited through the rear door of the store. When Pruitt realized that the fire was out of control, he warned the occupants to leave the building, and Pruitt fled the building through the front door exit.
After exiting the building, Pruitt pursued and caught up with Hall; at that time, Pruitt observed that Hall was both physically and mentally impaired. Pruitt enlisted the help of other individuals to detain Hall until the police arrived. Hall's three companions were also detained. When Pruitt returned to the store, the building was engulfed in smoke and flames. Nine people died and eleven others were injured from the fire.
At trial, the court heard expert testimony regarding the effectiveness of a functional sprinkler system in reducing smoke and fumes, and increasing survivability in a fireworks fire. Plaintiffs' fire protection expert, David Demers, concluded that the system installed at the store was capable of functioning if the water supply had not been shut off. Demers opined that the heat from the fire would have caused the first sprinkler head to have opened within thirty seconds after the fireworks were ignited, and that the sprinkler's discharge would have been sufficient to limit the fire and resulting toxic gases.
Defendant's expert, Dr. John Hoffman, determined that a conservative estimate for the atmospheric level of carbon monoxide gas in the store after a thirty-second burn period was eight percent, or 80,000 parts per million ("ppm"). Even at levels below that number, carbon monoxide enters the blood stream and combines with normal hemoglobin to produce "carboxyhemoglobin," a compound that prevents the absorption of oxygen. The lack of oxygen to body tissues and organs results in mental disorientation and then physical incapacitation. The trial court noted that, "[a]lthough it is difficult to accurately determine the level of CO that existed in the store in the moments following the onset of the blaze, the expert testimony presented at trial by both parties described an environment that would quickly cause incapacitation." In this regard, plaintiffs' toxicology expert, Dr. Yves Alarie, testified that, in an atmosphere of 20,000 ppm of carbon monoxide, survivability would be limited to approximately four and one-half minutes. Defendant's pathology expert, Dr. George Nichols, opined that at a carbon monoxide level of 80,000 ppm, incapacitation would occur after only two or three breaths.
The trial court noted that other highly toxic gases emitted by the burning fireworks, such as hydrogen cyanide and formaldehyde, also would have affected survivability. The court found that, given the lethal environment that developed within thirty seconds after the fireworks ignited, "even a fully functioning sprinkler system would not have completely prevented plaintiffs' injuries." However, the court also found that "defendant's argument that an operational sprinkler system would have made little or no difference in the outcome is implausible."
The facts set forth by the trial court also indicated that, between 1991 and the date of the incident, defendant's employees conducted at least twelve inspections of the Ohio River Fireworks Company, "including both the statutorily required annual inspections and additional seasonal inspections during the peak fireworks season which is May to July Fourth." The findings of each annual and seasonal inspection were recorded on a "fire safety inspection occupancy report form 903," which specifically listed the results of an examination of the sprinkler system. Each inspection report submitted as evidence indicated that there had been a satisfactory sprinkler test. The court noted, however, that "a memorandum report written on July 11, 1994, states that Fire Safety Inspector Thomas Baker conducted a non-scheduled walk-through inspection of the store and discovered that the water control valve was closed and that the sprinkler system was shut down."
James Saddler, a certified fire safety inspector, conducted the last annual re-licensing inspection for defendant of the fireworks store on October 12, 1995. Saddler testified that the store was required to have an automatic sprinkler system, and that he checked the sprinkler and its connected "water gong" alarm during each of his inspections. The October 12, 1995 annual report noted a satisfactory sprinkler test, and Saddler recommended approval of the store's license renewal.
On May 24, 1996, Daniel Lehman, an employee with the state Fire Marshal's office, issued a memorandum directing defendant's inspectors to conduct at least one "seasonal" inspection of all licensed fireworks facilities during the time period of May 24, 1996, to July 4, 1996. The seasonal inspection was to be conducted in addition to the annual licensing inspection provided under R.C. 3743.16 and 3743.17. The trial court found, however, that defendant's agents did not complete a seasonal inspection of the Ohio River Fireworks Company in 1996 because Lehman made a decision to postpone the inspection until investigators conducted an investigatory "bust-buy" operation. Lehman authorized the bust-buy operation because of a complaint received by the Fire Marshal's office on or about June 7, 1996, from a competitor of the Ohio River Fireworks Company, alleging that the store's employees were selling Class B fireworks without verifying that purchasers had exhibitor's licenses.
The bust-buy was conducted on June 28, 1996 by two Fire Safety Inspectors, Thomas Baker and Michael Kraft, and an arson investigator, Donald Eifler. After obtaining a search warrant and a body wire from local law enforcement officials, Eifler approached the store wearing the body wire, while Kraft and Baker remained in the their car monitoring Eifler's conversation with store employees. Eifler purchased one hundred dollars worth of Class B fireworks without being asked to produce an exhibitor's license. After Eifler made the purchase, Kraft entered the main store building to retrieve the money used in the bust-buy. The court noted that, "[a]lthough there was conflicting testimony at trial regarding the amount of time Eifler and Baker remained in the store, it is clear that their objective was to complete the bust-buy operation and that they did not perform a safety inspection on June 28, 1996."
At trial, the parties presented arguments regarding whether the public duty doctrine was applicable to the case. Plaintiffs assert that the public duty doctrine should not be applied because the fire marshal did not act pursuant to a statutory duty and because a special duty is owed to employees and customers of a firework's store. The trial court disagreed with plaintiffs' contention that defendant acted beyond its statutory public duty, and concluded that defendant did not assume an affirmative duty by performing seasonal inspections. The court also rejected plaintiffs' assertion that the "bust-buy" operation conducted on May 26, 1996, constituted a safety inspection, finding instead that the implementation of the bust-buy was directed toward the limited goal of purchasing Class B fireworks. The court concluded that "defendant's employees were acting in a law enforcement capacity at the time of the bust-buy, and no special relationship existed between plaintiffs and defendant as a result of that operation."
The trial court further found that, even if defendant's agents were negligent in implementing the discretionary decision to forego a seasonal inspection and implement the bust-buy operation, "defendant's duty relating to the bust-buy is one owed to the general public, not individuals, and therefore defendant did not breach a duty to plaintiffs." The court thus held that "plaintiffs have failed to demonstrate an individual duty, as opposed to a public duty."
Alternatively, the trial court found that the "sole proximate cause of plaintiffs' injuries was Hall's act of arson." Accordingly, the court concluded that, under the totality of the circumstances, the criminal act of a third party was not a foreseeable event for which defendant could be found liable under a negligence theory.
On appeal, plaintiffs set forth the following four assignments of error for review:
First Assignment of Error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS BY FINDING, CONTRARY TO THE ADMISSION OF THE STATE FIRE MARSHAL IN AN OFFICIAL CITATION, THAT AN INSPECTION WAS NOT PERFORMED ON JUNE 28, 1996.
Second Assignment of Error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS IN FINDING THAT THE PUBLIC DUTY DOCTRINE APPLIES TO THIS CASE.
Third Assignment of Error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS IN FINDING THAT THE CONDUCT OF A THIRD PARTY WAS AN INTERVENING ACT THAT WAS THE SOLE CAUSE OF THE FIRE IN QUESTION AND THAT THIS ACT WAS NOT FORESEEABLE.
Fourth Assignment of Error:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS BY RELYING ON THE TESTIMONY OF DEFENDANT'S EXPERT, DR. GEORGE NICHOLS, WHO BASED HIS OPINION OF THE PHYSIOLOGICAL EFFECTS OF THE FIRE SOLELY UPON THE INADMISSIBLE PRIOR OPINION OF DEFENDANT'S EXPERT, DR. JOHN HOFFMAN.
Plaintiffs' first and second assignments of error are interrelated and will be considered together. In general, plaintiffs contend that this case concerns the negligent inspection by defendant of the fireworks store on June 28, 1996, and that the trial court erred in finding that an inspection was not conducted on that date. Plaintiffs further assert that the trial court erred in finding that the public duty doctrine was applicable to the facts of this case. Plaintiffs also argue that, assuming the public duty doctrine prevents relief in this case, there is good reason to abandon its application to all cases except for police emergencies.
The primary issue presented is whether the trial court erred in finding that the public duty doctrine protected defendant from liability. At the outset, we note that Ohio law recognizes this common law rule. SeeSawicki v. Ottawa Hills (1988), 37 Ohio St.3d 222, paragraph three of the syllabus ("The public duty rule, and the special duty exception, comprise a doctrine which is independent of, and accordingly survived the abrogation of, sovereign immunity"). Generally, "[t]he public duty doctrine provides that a state cannot be held liable to an individual for breach of a duty owed to the general public: `When a duty which the law imposes upon a public official is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, is generally a public and not an individual injury.'" Burgess v. Doe (1996),116 Ohio App.3d 61, 66, quoting Sawicki, supra, at paragraph two of the syllabus. The public duty doctrine "is used to determine the first element of negligence, the existence of a duty on the part of the state."Bonds v. Ohio Dept. of Rehab. Corr. (1996), 116 Ohio App.3d 144, 157.
The public duty doctrine, however, is not an absolute defense, "as it must be considered with the principles of public duty, special relationship, and negligence." Burgess, supra, at 66. In Sawicki,supra, at paragraph four of the syllabus, the Ohio Supreme Court held that the following elements must be demonstrated in order to show the existence of a special duty or relationship:
 * * * (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.
R.C. Chapter 3743 sets forth Ohio's licensing procedures for wholesalers of fireworks, including provisions for inspections. R.C.3743.15(A) states that "any person who wishes to be a wholesaler of fireworks in this state shall submit to the fire marshal an application for licensure as a wholesaler of fireworks before the first day of October of each year." R.C. 3743.16(A) provides in part that, if a person "submits an application for licensure as a wholesaler of fireworks * * * the fire marshal shall review the application and accompanying matter * * * inspect the premises on which the fireworks would be sold, and determine whether the applicant will be issued the license."
R.C. 3743.17 provides in pertinent part:
 (A) The license of a wholesaler of fireworks is effective for one year beginning on the first day of December. The fire marshal shall issue or renew a license only on that date and at no other time. If a wholesaler of fireworks wishes to continue engaging in the wholesale sale of fireworks at the particular location after its then effective license expires, it shall apply not later than the first day of October for a new license pursuant to section 3743.15 of the Revised Code. * * *
R.C. 3743.21 authorizes the fire marshal to inspect the premises of a wholesaler to ensure compliance with R.C. Chapter 3743, stating as follows:
 (A) The fire marshal may inspect the premises, and the inventory, wholesale sale, and retail sales records, of a licensed wholesaler of fireworks during the wholesaler's period of licensure to determine whether the wholesaler is in compliance with Chapter 3743. of the Revised Code and the rules adopted by the fire marshal pursuant to section 3743.18 of the Revised Code.
 (B) If the fire marshal determines during an inspection conducted pursuant to division (A) of this section that a wholesaler is not in compliance with Chapter 3743. of the Revised Code or the rules adopted by the fire marshal pursuant to section 3743.18 of the Revised Code, the fire marshal may take one or more of the following actions, whichever the fire marshal considers appropriate under the circumstances:
 (1) Order, in writing, the wholesaler to eliminate, correct, or otherwise remedy the nonconformities within a specified period of time;
 (2) Order, in writing, the wholesaler to immediately cease its operations, if a fire or explosion hazard exists that reasonably can be regarded as posing an imminent danger of death or serious physical harm to persons. The order shall be effective until the nonconformities are eliminated, corrected, or otherwise remedied or for a period of seventy-two hours from the time of issuance, whichever first occurs. * * *
 (3) Revoke, or deny renewal of, the license of the wholesaler in accordance with Chapter 119. of the Revised Code;
 (4) Take action as authorized by section 3743.68 of the Revised Code. * * *
As noted, plaintiffs contend that this case concerns the negligent inspection by the defendant of the fireworks store on June 28, 1996. More specifically, plaintiffs assert that, although defendant had a statutory duty to conduct an annual inspection of the wholesaler's premises pertaining to license renewal, defendant had no statutory duty to perform "seasonal" inspections during the fireworks season. Plaintiffs argue that defendant voluntarily assumed a duty by instigating an inspection on June 28, 1996 during the "bust-buy," and that defendant's agents conducted the inspection in a negligent manner, thereby giving rise to tort liability outside the public duty doctrine.
In general, Ohio courts, including this court, have held that there is no liability for the nonperformance of an inspection or for the negligent performance of an inspection done pursuant to a statutory duty. InShelton v. Indus. Comm. (1976), 51 Ohio App.2d 125, 126, a plaintiff was seriously injured during the course of his employment when a boiler exploded. Plaintiffs filed a complaint in the Court of Claims against the state, alleging that certain state agencies were "negligent in the performance of their statutory duties to make various inspections and investigations." In Shelton, supra, at 130-131, this court affirmed the judgment of the Court of Claims finding no liability on the part of the state, holding in part:
 * * * The Court of Claims Act does not create new duties, it only provides a remedy for existing duties where the state was previously immune from suit and a private party under similar circumstances would have been liable.
 * * * [O]ne could say that a private party's duty to inspect and to enforce safety standards is not created by statute, but only by virtue of some other legal relationship and, hence, there is no rule of law making a private party liable for a failure to perform statutory duties of inspection and enforcement of safety standards which were enacted to protect the health, safety and welfare of all of the citizens of Ohio.
 * * * Statutes requiring state agencies to inspect and enforce safety standards were enacted to protect the public generally against unsafe conditions. They were not intended, nor should they be so construed, to create a duty toward any particular person. Likewise, their performance or nonperformance cannot be the basis of a tort action by an injured person.
See, also, Delman v. Cleveland Heights (1989), 41 Ohio St.3d 1, 4
(municipality, in conducting inspections of real estate for violations of city code pursuant to a point-of-sale inspection ordinance, did not owe a duty of care to purchaser or seller; court noted that "an apparent majority of courts which have reached the issue refuse to impose upon a municipality a duty of care to private individuals for building inspections.")
In Mercer v. United States (S.D.Ohio 1978), 460 F. Supp. 329, a federal court construed the provisions of the Federal Tort Claims Act in a wrongful death action brought against the government for negligent inspection of an Ohio mine. Under the facts of Mercer, the plaintiff alleged that agents of the government negligently performed mine inspections by failing to disclose that defendant failed to order the correction of certain violations of safety standards, proximately resulting in the death of plaintiff's decedent. In Mercer, the court noted that "no liability has been imposed by Ohio law for the failure to perform a duty of inspection imposed by statute alone." Id. at 331, citing Shelton, supra. The court in Mercer, supra, at 331-332, further held that:
 * * * [T]he Court does not believe that liability attaches when, as here, the government is neither contractually obligated to perform an inspection nor otherwise is in possession or control of the subject of the inspection, but is conducting an inspection in accordance with a statute which seeks to cause mine operators to comply with safety standards * * *.
* * *
 * * * The Secretary of the Interior is directed by * * * statute to promulgate standards "and [t]he operators of mines to which such standards are applicable [s]hall comply with such mandatory standards." * * * The Secretary is authorized to make such inspections "as he shall deem necessary" for determining whether the mine operators are in compliance with these standards. * * * Upon discovering a violation, the inspector may issue an order requiring the mine operator to withdraw all persons from the dangerous area. A federal inspector assumes no responsibility to maintain compliance with safety standards upon which either the mine operators or their employees can rely. The responsibility remains with the operator and is not shifted to the inspector by the act of undertaking an inspection. [Citations omitted.]
In the present case, the trial court rejected plaintiffs' contention that defendant's agents were not acting pursuant to statutory authority when it entered the store on June 28, 1996. Specifically, the court held that:
 * * * [P]ursuant to R.C. 3743.21(A), the fire marshal has the express authority to conduct an inspection of the fireworks facility's premises, including its inventory and records, to determine whether the store was in compliance with applicable statutes and rules adopted by the fire marshal. The court further finds that the language of R.C. 3743.21(A) does not limit the fire marshal's authority to conduct only annual inspections. Rather, it provides that that he `may inspect' at any time `during the wholesaler's period of licensure to determine whether the wholesaler is in compliance.' Accordingly, the court finds that defendant did not act beyond its statutory public duty and, therefore, did not assume an affirmative duty by performing seasonal inspections.
Upon review, we agree with the trial court's finding that defendant did not act beyond its statutory authority when defendant's agents conducted the bust-buy investigation on June 28, 1996. Although R.C. sections3743.15, 3743.16 and 3743.17 provide in general that the license of a wholesaler is effective for one year, and that renewal of a license requires submission of a new application, including an inspection requirement, R.C. Chapter 3743 does not limit authorization for inspections to one per year. Rather, as noted by the trial court, pursuant to R.C. 3743.21, the fire marshal is authorized to inspect the premises of a licensed wholesaler "during the wholesaler's period of licensure to determine whether the wholesaler is in compliance with Chapter 3743. of the Revised Code." Accordingly, defendant and its agents possessed statutory authority to enter the premises to determine whether the wholesaler was in compliance with statutory prohibitions against the sale of Class B fireworks to persons other than licensed exhibitors. We further note that we agree with the trial court's conclusion that the evidence indicates that the purpose of the bust-buy was not a safety inspection to discover fire hazards; however, even assuming that a safety inspection took place, such inspection would not have fallen outside the statutory authority of defendant. Thus, because defendant was acting within its statutory authority, any purported negligence by defendant's agents would fall within the public duty doctrine and preclude liability in the absence of a finding of a special duty or relationship, to be discussed infra.
Plaintiffs also argue that the public duty doctrine is inapplicable because R.C. Chapter 3743 creates a duty to a special class of people, fireworks store customers and employees, and that these statutory provisions are not meant to benefit the general public. We do not construe the provisions of R.C. Chapter 3743 so narrowly. Rather, we conclude that the statutes at issue, "requiring state agencies to inspect and enforce safety standards," were enacted to protect "the public generally against unsafe conditions." Shelton, supra, at 131. See, also, Gill v. Caesar's, Inc. (Jan. 16, 1986), Cuyahoga App. No. 49886, unreported ("Statutes requiring inspection, and enforcement of safety standards were enacted to protect the general public, and not to create a duty toward any one person.") We note that in Pizza v. Sunset FireworksCo. (1986), 25 Ohio St.3d 1, 5, the Ohio Supreme Court "liberally construe[d] the Fireworks Code so as to promote the health, safety and welfare of the people of the state." The court noted that "[t]he very fact that this chapter was placed within Title 37 of the Revised Code which relates to health, safety and morals lends support to the courts' conclusion." Id. at 4. See, also, Van Camp v. Riley (1984),16 Ohio App.3d 457, 460 (construing R.C. Chapter 3743 to promote the public safety; "the enactments of the legislature in the exercise of its police power are statewide in their application, and deal * * * with businesses which, if not regulated, would pose a threat to the health, safety and welfare of all the people of the state.")
It has been noted that "[t]he public duty doctrine implicitly presupposes that the state's duty to the public is a duty that is not shared by private parties, [and] cases finding that the state or other governmental unit owed a duty only to the public involve uniquely governmental functions." Jones v. Ohio Dept. of Health, Div. of Pub.Health Laboratories (1990), 69 Ohio App.3d 480, 487-488. Here, defendant's statutory duty regarding the licensing, inspection and regulation of wholesalers of fireworks implicates uniquely governmental functions not engaged in by private parties, and we agree with the trial court that the conduct at issue falls within the public duty doctrine. See, e.g., Ashland Cty. Bd. of Commrs. v. Ohio Dept. of Taxation (1992),63 Ohio St.3d 648, 654 ("This court has regularly found that statutory duties imposed upon state officials to regulate, inspect * * * [or] license * * * are `public' duties" and "do not flow to any private individual.") Thus, any alleged negligence in failing to properly perform an inspection did not involve a duty of care to any particular individual or class of individuals.
Having concluded that the conduct at issue relates to a duty imposed by law that is owed to the public in general, we next consider whether the trial court erred in finding the absence of a special duty or relationship as an exception to the public duty doctrine. Franklin v.Columbus (1998), 130 Ohio App.3d 53, 60. As previously noted, in order to establish such a special duty or relationship, the following elements are required: (1) an assumption by the governmental entity of a duty to act on behalf of the injured party either through promises or actions; (2) knowledge on the part of the governmental agents that inaction could lead to harm; (3) some form of direct contact between the governmental agents and the injured party; and (4) the injured party's justifiable reliance on the governmental entity's affirmative undertaking. Sawicki, supra, at paragraph four of the syllabus.
In the present case, at least two of the elements required by Sawicki
are not present. Specifically, the facts do not show any direct contact between defendant and the injured parties, nor do the facts indicate that the injured parties relied upon any affirmative undertaking to act on their behalf. We note that plaintiffs do not specifically discuss the individual elements of the Sawicki analysis, but rather argue in general that a special relationship was created by the fact that R.C. 3743.44 and 3743.45 require customers to identify themselves on purchaser's forms.[1]
We disagree.
Although there is no evidence that any of the plaintiffs in this case completed or signed a purchaser form, even assuming such evidence, plaintiffs would have failed to establish a "special relationship." InSawicki, supra, the Ohio Supreme Court held that "a telephone conversation between a member of the general public and a police department, wherein the caller requests help and the police operator says he will send help, is insufficient as a matter of law to establish a special relationship between the caller and the police." Id. at 232-233. The facts of the instant case are more tenuous than the facts inSawicki, and we conclude that the purchaser's forms at issue, indicating that a purchaser will take fireworks out of the state, did not create a special relationship between defendant and the injured parties.
Plaintiffs also assert that Ohio should abandon the public duty doctrine, arguing that the doctrine "is nothing more than a form of sovereign immunity created by the courts to avoid imposing responsibility once the legislature has abrogated sovereign immunity." Plaintiffs maintain that they "do not believe" the Ohio Supreme Court would recognize this doctrine as defendant seeks it to be applied in this case. Finally, plaintiffs concede that this court "must follow the dictates of past Supreme Court decisions, and raise this issue to preserve it for further review by the Supreme Court."
As noted by plaintiffs, this court is bound to follow the law as determined by the Ohio Supreme Court. See, e.g., Consolidated Rail Corp.v. Forest Cartage Co. (1990), 68 Ohio App.3d 333, 341 ("All trial courts and intermediate courts of appeal are charged with accepting and enforcing the law as promulgated by the Supreme Court not changing, modifying or ignoring that law.") In Sawicki, supra, the Ohio Supreme Court reaffirmed the public duty doctrine, and the court has continued to apply the doctrine in subsequent cases. See, e.g., Delman, supra, (public duty doctrine precluded liability against city for real estate inspections conducted pursuant to inspection ordinance); Williamson v.Pavlovich (1989), 45 Ohio St.3d 179, 186 (enforcement of traffic ordinance was a duty to the public generally and the failure to perform, or inadequate performance of this type of duty in the absence of a special relationship is a public and not individual injury); Hurst v.Ohio Dept. of Rehab. Corr. (1995), 72 Ohio St.3d 325, 329 ("Because appellee has failed to establish the existence of a special duty owed the decedent by the state, the public duty rule applies to bar liability on the part of the Adult Parole Authority"). Thus, inasmuch as the Ohio Supreme Court has not abolished the public duty doctrine, we decline any invitation to declare abandonment of the doctrine.
Finally, we note that one of the primary cases relied upon by plaintiffs is the Alaska Supreme Court's decision in Adams v. State
(Alaska 1976), 555 P.2d 235, in which the court imposed liability upon a governmental entity for failing to adequately enforce fire and safety codes as part of an inspection. In Adams, the court found the public duty doctrine to be inconsistent with the legislature's abrogation of sovereign immunity. As previously noted, however, the Ohio Supreme Court, in Sawicki, supra, rejected this rationale, holding that "[t]he public duty rule, and the special duty exception, comprise a doctrine which is independent of, and accordingly survived the abrogation of, sovereign immunity." Id. at paragraph three of the syllabus. We also note that the holding of the Adams case was subsequently abrogated by statute. See Wilson v. Municipality of Anchorage (Alaska 1983),669 P.2d 569, 571 (noting that in 1977, following the decision in Adams,supra, "the legislature amended AS 09.65.070 to preclude municipal liability in actions based on the inspection of private property for violations of statutes, regulations and ordinances, or for hazards to health or safety.")
In the present case, the trial court held that "defendant owed no special duty to plaintiffs that was separate from its duty owed to members of the general public." In so holding, the trial court adhered to legal principles that "the government is not amenable to suit by a private individual for a breach of a public duty," and that public duties "will not form the basis for liability * * * in the absence of a special relationship." Ashland Cty. Bd. of Commrs., supra, at 654. We agree with the trial court's determination that the circumstances of this case, while undeniably tragic, fell within the public duty doctrine and did not give rise to a special relationship between defendant and the injured parties. Thus, in the absence of the existence of a duty, we conclude that the trial court properly found in favor of defendant on plaintiffs' negligence claim. Accordingly, plaintiffs' first and second assignments of error are overruled.
Based upon our disposition of the first and second assignments of error, the issues raised under the third and fourth assignments of error, regarding the expert testimony of defendant's witness and the court's finding that the criminal act of a third party was unforeseeable, are rendered moot.
Based upon the foregoing, plaintiffs' first and second assignments of error are overruled, plaintiffs' third and fourth assignments of error are rendered moot, and the judgment of the trial court is hereby affirmed.
GEORGE, J., concurs.
KENNEDY, J., concurs separately.
GEORGE, J., retired, of the Ninth Appellate District assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] R.C. 3743.44 pertains to sales to nonresidents, and R.C. 3743.44(B) states in part that "[a] licensed * * * wholesaler selling fireworks under this section shall require the purchaser to complete a purchaser's form." The form is required to include the purchaser's name and address, date of purchase, the destination to which the fireworks will be transported and the purchaser's signature. R.C. 3744.45 contains a similar form requirement for sales of fireworks to Ohio residents.